STATE OF CONNECTICUT *v.* PAUL DeFUSCO
(14544)

PETERS, C. J., CALLAHAN, BERDON, NORCOTT and KATZ, Js.

Argued November 3, 1992—decision released February 23, 1993

*John R. Donovan,* for the appellant (defendant).

*Judith Rossi,* assistant state's attorney, with whom were *Lisa Riggione,* assistant state's attorney, and, on the brief, *Michael Dearington,* state's attorney, for the appellee (state).

PETERS, C. J. The principal issue in this appeal is whether article first, § 7, of the Connecticut constitution[1] prohibits the police from conducting warrantless searches and seizures of garbage placed at the curb for collection. The state charged the defendant, Paul DeFusco, by substitute information with possession of narcotics with intent to sell in violation of General Statutes § 21a-277 (a),[2] and the trial court accepted his conditional plea of nolo contendere.[3] The defendant

---

[1] Article first, § 7, of the Connecticut constitution provides: "The people shall be secure in their persons, houses, papers and possessions from unreasonable searches or seizures; and no warrant to search any place, or to seize any person or things, shall issue without describing them as nearly as may be, nor without probable cause supported by oath or affirmation."

[2] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[3] The defendant's plea of nolo contendere was conditioned on his right to appeal the trial court's denial of his motion to suppress. See General Statutes § 54-94a; Practice Book § 4003.

appealed to the Appellate Court, which affirmed the judgment of conviction. *State* v. *DeFusco*, 27 Conn. App. 248, 606 A.2d 1 (1992). We subsequently granted the defendant's petition for certification to appeal.[4] *State* v. *DeFusco*, 222 Conn. 910, 608 A.2d 692 (1992). We affirm.

The relevant facts are as follows. On October 12, 1990, the Hamden police department executed a search warrant for 19 Building Brook Road, the defendant's residence. The warrant had been issued on the basis of an affidavit signed by two Hamden police officers experienced in narcotics investigations. The affidavit recited information provided by a confidential informant and described items obtained during several September, 1990 "garbage pulls" by Hamden police officers from garbage placed for collection at the curb in front of the defendant's house.[5] In the course of their

---

[4] Our order on the defendant's petition for certification to appeal; *State* v. *DeFusco*, 222 Conn. 910, 608 A.2d 692 (1992); granted the petition limited to the following issues:

"1. Does article first, § 7, of the Connecticut constitution protect garbage left for collection at the curbside of a residence?

"2. If the answer to the first question is 'no,' was the search warrant in this case supported by probable cause?"

[5] The trial court described the defendant's placement of the garbage as "at the side of the street" and "at the curb." The Appellate Court, on the other hand, phrased the issue before it as whether garbage "left for collection outside the curtilage of a residence, but adjacent thereto" enjoys protection under article first, § 7, of the Connecticut constitution. *State* v. *DeFusco*, 27 Conn. App. 248, 255, 606 A.2d 1 (1992). Because neither party has raised an issue regarding the precise location of the garbage when it was searched and seized by the police, it is not necessary to resolve that question of fact here. We decline to delve into the possible factual scenarios that are outside the scope of the certified question and that may arise in future cases, such as garbage left for collection inside a closed garage; see *State* v. *Stevens*, 123 Wis. 2d 303, 314, 367 N.W.2d 788 (1985); and garbage placed for collection in a container in an indoor garbage room of an apartment building. See *Smith* v. *State*, 510 P.2d 793, 797 (Alaska), cert. denied, 414 U.S. 1086, 94 S. Ct. 603, 38 L. Ed. 2d 489 (1973). For purposes of this decision, we refer to the location of the defendant's garbage as "at the curb" or "curbside" because the certified question and both parties' briefs use one or both of these neutral descriptions.

search of the defendant's home, the police seized narcotics, drug paraphernalia, weapons and cash. The police arrested the defendant and charged him with various narcotics offenses.

The defendant moved to suppress the evidence seized from his home during the search.[6] He argued that the warrantless garbage pulls violated article first, § 7, of the Connecticut constitution and, therefore, that the items taken from the garbage should not have been relied on in the warrant affidavit. Without reference to the items taken from the garbage, the defendant claimed, the affidavit failed to establish probable cause. He also claimed, in the alternative, that the information contained in the affidavit was insufficient to establish probable cause even if the items obtained in the garbage pulls were properly considered. Relying on the defendant's diminished expectation of privacy in the garbage that he had voluntarily placed curbside, the trial court determined that the garbage pulls had been constitutionally valid. The trial court concluded, therefore, that the affidavit had properly included reference to items obtained in those garbage pulls and had established probable cause. Accordingly, the trial court denied the defendant's motion to suppress. The trial court subsequently accepted the defendant's plea of nolo contendere, and sentenced him to an eight year term of imprisonment, execution suspended after two years and probation for three years.

The defendant appealed his conviction to the Appellate Court; State v. DeFusco, supra, 27 Conn. App. 248; claiming that the trial court had improperly determined that (1) the garbage searches and seizures had not violated article first, § 7, of the Connecticut constitution, and (2) the affidavit, which properly included reference

---

[6] The defendant also filed a motion to dismiss that raised, inter alia, the same claims. The trial court never specifically acted on that motion.

to the items seized in the garbage searches, had established probable cause. The Appellate Court affirmed.

In this appeal, the defendant reiterates the claims that he raised in the Appellate Court. Specifically, he argues that the Appellate Court improperly affirmed the trial court's determinations that (1) the search and seizure of the defendant's garbage had been permissible under article first, § 7, of the Connecticut constitution and (2) the affidavit, containing information obtained in the garbage searches, had established probable cause.

I

The defendant's principal claim is that the Hamden police department's warrantless searches and seizures of his garbage violated article first, § 7, of the Connecticut constitution.[7] We disagree.

Although the United States Supreme Court has expressly held that the fourth amendment to the federal constitution[8] does not protect against warrantless police searches and seizures of garbage placed at the curb for collection; *California* v. *Greenwood*, 486 U.S.

---

[7] The defendant argues that, if he were to prevail on this claim, the subsequent search of the defendant's home and the seizure of evidence would be rendered illegal because the affidavit, stricken of the improper information, was insufficient to establish probable cause. Neither party has contested the conclusion reached by the trial court, and affirmed by the Appellate Court, that, without reference to those items, the warrant affidavit would not have established probable cause. *State* v. *DeFusco*, 27 Conn. App. 248, 253, 606 A.2d 1 (1992).

[8] The fourth amendment to the United States constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

The fourth amendment was made applicable to the states through the fourteenth amendment's due process clause. *Wolf* v. *Colorado*, 338 U.S. 25, 27–28, 69 S. Ct. 1359, 93 L. Ed. 1782 (1949). The fourth amendment's

35, 37, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988); we may find greater protection of individual rights under our state constitution than that provided by the federal constitution. "It is well established that federal constitutional and statutory law establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. . . ." (Internal quotation marks omitted.) *State* v. *Oquendo,* 223 Conn. 635, 649, 613 A.2d 1300 (1992). Moreover, we have held that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort . . . . In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut citizens have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." (Internal quotation marks omitted.) *State* v. *Marsala,* 216 Conn. 150, 160, 579 A.2d 58 (1990). Recognizing that our state constitution "is an instrument of progress . . . is intended to stand for a great length of time and should not be interpreted too narrowly or too literally"; (internal quotation marks omitted) *State* v. *Oquendo,* supra, 649; we have concluded in several cases that the state constitution provides broader protection of individual rights than does the federal constitution. See, e.g., id., 652; *State* v. *Marsala,* supra, 171; *State* v. *Dukes,* 209 Conn. 98, 112, 547 A.2d 10 (1988), and cases cited therein.

prohibition against the use of illegally obtained evidence was made applicable to the states through the fourteenth amendment. *Mapp* v. *Ohio,* 367 U.S. 643, 655–56, 81 S. Ct. 1684, 6 L. Ed. 2d 1081, reh. denied, 368 U.S. 871, 82 S. Ct. 23, 7 L. Ed. 2d 72 (1961).

In this case, we must decide whether article first, § 7, of the Connecticut constitution affords greater protection than does federal law against warrantless searches of garbage placed at the curb for collection. For present purposes, we assume that our determination of whether garbage placed at the curb for collection falls within the protection of article first, § 7, is governed by the two-part standard that is used under the federal constitution and many other states' constitutions: (1) has the owner or custodian of the garbage manifested a subjective expectation of privacy with respect to it?; and (2) is that expectation one that society would consider reasonable? *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring); see, e.g., *California* v. *Greenwood,* supra, 39; *Commonwealth* v. *Pratt,* 407 Mass. 647, 660, 555 N.E.2d 559 (1990); but see *State* v. *Hempele,* 120 N.J. 182, 198, 576 A.2d 793 (1990). Although we have never addressed the proper standard for determining the applicability of article first, § 7, neither party contests the appropriateness of using the *Katz* test in this case. Rather, the parties' primary disagreement concerns the second part of the standard, namely, whether an expectation of privacy in garbage placed at the curb for collection is one that Connecticut citizens would recognize as reasonable.[9]

Because the focus of our inquiry, therefore, is the objective reasonableness of a person's expectation of privacy in garbage placed curbside for collection,[10] it

---

[9] We decline to address the state's briefly stated contention that the defendant did not meet the first part of the *Katz* test. The trial court's and Appellate Court's decisions were not based on this factor, and, in any case, whether the defendant possessed a subjective expectation of privacy as to the garbage is unnecessary to the resolution of this case in light of our conclusion that the defendant has not satisfied the second part of the *Katz* test.

[10] The reasonable expectation of privacy inquiry is essentially identical to the constitutional abandonment inquiry. See *State* v. *Mooney,* 218 Conn. 85, 107, 588 A.2d 145, cert. denied,      U.S.     , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

is useful, at the outset, to identify several other issues, addressed by the parties, that are unnecessary to our decision. First, whether the defendant effected a property law abandonment of his garbage by placing it at the curb for collection is not determinative of the defendant's state constitutional claim. As we have recently held, property law abandonment and constitutional abandonment are independent concepts. See *State* v. *Mooney,* 218 Conn. 85, 106–107, 588 A.2d 145, cert. denied,      U.S.     , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).[11]

Second, our respect for the sanctity of the home is not a factor in the circumstances of this case because article first, § 7, covers not only a person's home but also his "papers" and "possessions." Whether or not the garbage was located on the defendant's property when searched; see footnote 5, supra; therefore, is not dispositive of the constitutional protection afforded by § 7. Accordingly, the state's citation to several of our previous cases in which we emphasized that § 7 affords the highest protection against state invasion into the home; e.g., *State* v. *Geisler,* 222 Conn. 672, 687–90, 610 A.2d 1225 (1992); is unavailing insofar as the language of § 7 dispels the notion that § 7 protects *only* the home.

Third, our decision does not rely on the textual difference between the fourth amendment and article first, § 7. At oral argument before this court, the state argued that, because the fourth amendment protects, inter alia, "effects," whereas § 7 protects, inter alia, the narrower category of "possessions," the state constitution cannot be interpreted to provide more pro-

---

[11] We note, however, that, if a person has abandoned an object in the property law sense, that person's intent to discard may be relevant to the constitutional inquiry whether the person actually possessed an expectation of privacy as to that object and whether such expectation was reasonable. See *State* v. *Mooney,* 218 Conn. 85, 107, 588 A.2d 145, cert. denied,      U.S.     , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

tection than does the federal constitution. Because this particular issue was neither briefed by the parties nor raised below, we decline to determine in this case the significance of the use of different words by the two provisions.

Finally, our decision in this case does not rely on the arguable lack of a historical foundation for the claim that article first, § 7, was intended to protect against warrantless searches of garbage placed at the curb for collection. Although we have, on occasion, employed a historical analysis of state constitutional provisions to aid in our determination of their content; see, e.g., *State* v. *Oquendo,* supra, 650–52 ("seizure" under article first, §§ 7 and 9); *State* v. *Barton,* 219 Conn. 529, 538 n.4, 594 A.2d 917 (1991) ("probable cause" under article first, § 7); see also, e.g., *State* v. *Miller,* 29 Conn. App. 207, 217–19, 614 A.2d 1229, cert. granted, 224 Conn. 914, 915, 614 A.2d 170 (1992) (warrant requirement under article first, § 7); the arguments of both the defendant and the state emphasized the discussion of what Connecticut citizens would consider reasonable in the present day. Indeed, the reasonable expectation of privacy analysis is peculiarly focused on current conditions and requires a factual inquiry into all the relevant circumstances of the search. See *State* v. *Pittman,* 209 Conn. 596, 601, 553 A.2d 155 (1989). In this case, therefore, we confine our inquiry to contemporary considerations without reliance on the historical circumstances surrounding the adoption of article first, § 7.

We now address the primary issue on which the defendant's state constitutional argument turns: whether the defendant's expectation of privacy in garbage placed at the curb for collection was objectively reasonable under the circumstances. Because we conclude that such an expectation was not reasonable, we are persuaded that article first, § 7, did not prohibit the garbage pulls conducted by the Hamden police.

When the defendant placed his garbage at the curb in front of his house for collection by the garbage collector, a myriad of intruders, purposeful or errant, could legally have sorted through his garbage. For instance, garbage collectors in Connecticut have a statutory duty to assist municipal authorities in identifying recycling violators.[12] See General Statutes § 22a-220c (a). This required assistance necessarily entails the authority to inspect the contents of garbage placed for collection.[13] Moreover, the owner or operator of a solid waste facility[14] or a resources recovery facility[15] has the statutory obligation to conduct periodic unannounced inspections of loads delivered to the facility to assist municipalities and the commissioner of environmental protection in assessing recycling compliance.[16] See General Statutes § 22a-220c (b). It is also

---

[12] Pursuant to General Statutes § 22a-241b (c), recycling of designated items has been mandatory in Connecticut since January 1, 1991.

[13] Connecticut's regulation of garbage thus differs from New Jersey's regulation. See *State* v. *Hempele*, 120 N.J. 182, 207, 576 A.2d 793 (1990) ("[w]e are not sure whether garbage collectors have the legal right to look through closed trash bags").

[14] General Statutes § 22a-207 (4) defines "[s]olid waste facility" as "any solid waste disposal area, volume reduction plant, transfer station, woodburning facility or biomedical waste treatment facility."

[15] General Statutes § 22a-207 (9) defines "[r]esources recovery facility" as "a facility utilizing processes to reclaim energy from municipal solid waste."

[16] It is not the state regulation per se that persuades us that the defendant had no reasonable expectation of privacy in garbage that he placed at the curb for collection. Rather, we consider the statutes regulating garbage collection, disposal and recycling to constitute one factor reflecting the Connecticut citizenry's attitudes and expectations regarding garbage. Those statutes are useful in our determination of whether the defendant's state constitutional right to be free of unreasonable searches and seizures was violated, because that determination turns, in this case, on whether the defendant's expectation of privacy in curbside garbage was one that Connecticut citizens would recognize as reasonable. We do not, as the dissent suggests, rely on the recycling statute to define the scope of the important rights guaranteed by article first, § 7, of the Connecticut constitution. We, therefore, disagree with the New Jersey Supreme Court's view, which the dissent in this case appears to share, that "[g]overnment regulation

a matter of common knowledge that garbage placed at the curb is subject to intrusion by a variety of people, with a variety of purposes, including bottle and coupon collecting, antique hunting, food searching and snooping. See also *California* v. *Greenwood,* supra, 40. Finally, we regard it to be common knowledge among citizens of this state that dogs, raccoons, or other creatures may intrude upon and expose the contents of garbage that has been placed for collection in an accessible area.[17]

In light of our recognition of these potential intrusions on garbage placed at the curb for collection, the defendant's argument for state constitutional protection against police searches of his garbage devolves into an argument that a person may harbor different expectations of privacy, all of which are reasonable, as to different classes of intruders. We cannot countenance such a rule. A person's reasonable expectations as to a particular object cannot be compartmentalized so as to restrain the police from acting as others in society are permitted or suffered to act. We have impliedly rejected such illogical linedrawing, and our Appellate Court has expressly done so. See *State* v. *Brown,* 198 Conn. 348, 357, 503 A.2d 566 (1986); *State* v. *Liptak,* 21 Conn. App. 248, 255, 573 A.2d 323, cert. denied,

becomes relevant only once it has been determined that constitutional protections do apply." *State* v. *Hempele,* 120 N.J. 182, 211, 576 A.2d 793 (1990).

[17] Our conclusion that the defendant had no reasonable expectation of privacy in garbage placed at the curb for collection is not undermined by the fact that the legislature has authorized municipalities to prohibit the scavenging of solid waste. General Statutes § 22a-220a (h). This authorization does not itself support the existence of a reasonable expectation of privacy. In any case, however, Hamden's solid waste disposal ordinance prohibits only the scavenging of solid waste at the *landfill,* not the scavenging of solid waste placed at the curb for collection. See Hamden Town Code of Ordinances § 94.40 (H) (1990); cf. *California* v. *Greenwood,* 486 U.S. 35, 52, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) (Brennan, J., dissenting) (describing town ordinance prohibiting scavenging of any items placed for garbage collection).

215 Conn. 809, 576 A.2d 540 (1990). Most federal and state courts agree. See, e.g., *California* v. *Ciraolo,* 476 U.S. 207, 213–14, 214 n.2, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986); *State* v. *Henderson,* 435 N.W.2d 394, 396 (Iowa 1988); *State* v. *Trahan,* 229 Neb. 683, 688–89, 428 N.W.2d 619 (1988); *State* v. *Byrne,* 149 Vt. 224, 228, 542 A.2d 276 (1988).[18] A person either has an

---

[18] Four state courts, however, have either explicitly or implicitly engaged in such linedrawing in the course of determining, as a matter of state constitutional law, that garbage placed at the curb for collection is protected against warrantless police searches. *People* v. *Krivda,* 5 Cal. 3d 357, 367, 486 P.2d 1262, 96 Cal. Rptr. 62 (1971) (en banc), vacated, 409 U.S. 33, 93 S. Ct. 32, 34 L. Ed. 2d 45 (1972) (remanding for determination whether holding was based on state or federal law), on remand, 8 Cal. 3d 623, 504 P.2d 457, 105 Cal. Rptr. 521 (state constitutional basis is independent ground for decision), cert. denied, 412 U.S. 919, 93 S. Ct. 2734, 37 L. Ed. 2d 145 (1973); *State* v. *Tanaka,* 67 Haw. 658, 662, 701 P.2d 1274 (1985); *State* v. *Hempele,* 120 N.J. 182, 215, 576 A.2d 793 (1990); *State* v. *Boland,* 115 Wash. 2d 571, 578, 800 P.2d 1112 (1990) (en banc).

The New Jersey Supreme Court afforded such protection on the basis of its express conclusion that a person may reasonably hold a different expectation of privacy in garbage as against the police than as against others. *State* v. *Hempele,* supra, 206 ("[w]e expect officers of the State to be more knowledgeable and respectful of people's privacy than are dogs and curious children"). The other state courts that have held that their state constitutions afford protection against warrantless police searches of curbside garbage have recognized impliedly that a person may have different expectations of privacy in garbage, all of which are reasonable, as to different people. See *People* v. *Krivda,* supra, 367 ("defendants had a reasonable expectation that their trash would not be rummaged through and picked over by police officers acting without a search warrant"); *State* v. *Tanaka,* supra, 662 ("[p]eople reasonably believe that police will not indiscriminately rummage through their trash bags to discover their personal effects"); *State* v. *Boland,* supra, 581 ("[w]hile a person must reasonably expect a licensed trash collector will remove the contents of his trash can, this expectation does not also infer an expectation of governmental intrusion").

Despite careful consideration of each of these cases, we are persuaded that, in the circumstances of this case, article first, § 7, of the Connecticut constitution did not prohibit the search and seizure of the defendant's garbage conducted by the Hamden police. Some of these cases involved the interpretation of unique state constitutional provisions; *State* v. *Boland,* supra, 577 (article 1, § 7 of the Washington constitution provides: "No person shall be disturbed in his private affairs, or his home invaded, without authority of law"); or particular fact patterns; *State* v. *Tanaka,* supra,

objectively reasonable expectation of privacy or does not; what is objectively reasonable cannot, logically, depend on the source of the intrusion on his or her privacy.

We conclude, therefore, that the defendant had no reasonable expectation of privacy in the garbage he placed at the curb for collection. Accordingly, its search and seizure by the police did not violate article first, § 7, of the Connecticut constitution.[19]

## II

We now turn to the defendant's claim that, even if the affidavit in support of the search and seizure warrant properly included reference to the items obtained during the garbage pulls, the information contained in the affidavit was not sufficiently specific or informative to establish probable cause. We are not persuaded.

The following additional facts are relevant to this claim. The affidavit stated that, on August 15, 1990, a "known and reliable" informant, whom the Hamden police had utilized numerous times in narcotics cases,

---

659–60 (police trespassed on defendants' property to seize the garbage). Finally, the authority of the California case, *People* v. *Krivda,* supra, has been rendered suspect by an amendment to the California constitution that limits a criminal defendant's right to be free of unreasonable searches and seizures to the protection afforded under the federal constitution. See G. Uelmen, "The California Constitution After Proposition 115," 3 Emerging Issues in State Constitutional Law 33, 40 (1990).

[19] We are sensitive to the reality that, in our complex society, some Connecticut residents may legally generate garbage that reveals highly personal information. Medical information or products, financial documents and personal letters are among those items that we think it reasonable for Connecticut residents to wish to maintain as confidential. Cf. *Maher* v. *Freedom of Information Commission,* 192 Conn. 310, 320, 472 A.2d 321 (1984). We note, however, that the record is barren with regard to any steps taken by the defendant to secrete his garbage, such as eradicating any identifying items in the garbage that would be necessary to link the garbage to him. Indeed, at oral argument before this court, the state asserted that the significance of the prescription bottles recovered during the garbage pulls was merely their linkage of the other items to the defendant.

had told Hamden police investigator Charles Grady that the defendant was selling one ounce quantities of cocaine from his Hamden residence. The affidavit further stated that the informant had told Grady that the defendant, a construction or carpentry foreman who supplemented his income by selling cocaine, sold approximately one half kilo of cocaine every two weeks.

According to the affidavit, the affiants obtained from the informant a description of the defendant's vehicles, a description and name of the person from whom the defendant received his cocaine supply and a description of that person's vehicle and town of residence. The affiants were also given information regarding the persons from whom the defendant's supplier obtained cocaine. The affiants related that they had confirmed the information regarding both the defendant's cars and the defendant's supplier's cars and residence. The affidavit further stated that the informant had told the Hamden police that the defendant had a longtime heroin addiction and used heroin daily.

Moreover, the affidavit related that, during September, 1990, Hamden police officers had conducted several "garbage pulls" from garbage at the defendant's residence. As a result of a garbage pull on September 5, 1990, Grady found two prescription bottles bearing the defendant's name and three small glassine baggies that were the type used to package cocaine and heroin. One baggie was labeled "Bad Med." The affidavit also stated that, as a result of a garbage pull on September 26, 1990, Grady had recovered a prescription bottle bearing the defendant's name, several short cut straws, and two glassine baggies that were the type used to package cocaine and heroin.[20] Finally, the affidavit stated that, in 1988, the Hamden police had

---

[20] The affidavit stated that attempted garbage pulls on September 12 and 19, 1990, were unsuccessful because no garbage had been placed for collection on those days.

received an anonymous complaint that the defendant was selling one ounce quantities of cocaine from the same residence.

Our determination of whether the affidavit established probable cause pursuant to article first, § 7, of the state constitution is governed by the "totality of the circumstances" test enunciated in *State* v. *Barton,* 219 Conn. 529, 544, 594 A.2d 917 (1991).[21] See also *Illinois* v. *Gates,* 462 U.S. 213, 230–32, 103 S. Ct. 2317, 76 L. Ed. 2d 527, reh. denied, 463 U.S. 1237, 104 S. Ct. 33, 77 L. Ed. 2d 1453 (1983). This test requires the issuing judge to make "a practical, nontechnical decision whether, given all the circumstances set forth in the warrant affidavit, including the veracity and the basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *State* v. *Rodriguez,* 223 Conn. 127, 135, 613 A.2d 211 (1992).

"When an affidavit indicates that the police have relied on information from a confidential informant, the magistrate should examine the affidavit to determine whether it adequately describes both the factual basis of the informant's knowledge and the basis on which the police have determined that the information is reliable. If the warrant affidavit fails to state in specific terms how the informant gained his knowledge or why the police believe the information to be trustworthy, however, the magistrate can also consider all the circumstances set forth in the affidavit to determine whether, despite these deficiencies, other objective indicia of reliability reasonably establish that probable cause to search exists. In making this deter-

---

[21] We apply the standard enunciated in *State* v. *Barton,* 219 Conn. 529, 544, 594 A.2d 917 (1991), because, as the Appellate Court noted, the holding in *Barton* is retroactively applicable. *State* v. *DeFusco,* 27 Conn. App. 248, 253 n.4, 606 A.2d 1 (1992); see *State* v. *Barton,* supra, 552–53.

mination, the magistrate is entitled to draw reasonable inferences from the facts presented." (Internal quotation marks omitted.) *State* v. *Johnson,* 219 Conn. 557, 563, 594 A.2d 933 (1991).

In our review of the defendant's claim, we will uphold "the validity of [the] warrant . . . [if] the affidavit at issue presented a substantial factual basis for the magistrate's conclusion that probable cause existed." (Internal quotation marks omitted.) *State* v. *Duntz,* 223 Conn. 207, 215, 613 A.2d 224 (1992). "In a doubtful or marginal case . . . our constitutional preference for a judicial determination of probable cause leads us to afford deference to the magistrate's determination." *State* v. *Johnson,* supra, 565. With these principles in mind, we now consider whether there was a substantial factual basis for the issuing judge's conclusion that the affidavit established probable cause.

A

We consider first the information provided by the informant. "Although, under [the totality of the circumstances] standard, we no longer rigidly apply the two-pronged . . . test [pursuant to *State* v. *Kimbro,* 197 Conn. 219, 496 A.2d 298 (1985)], the determination of an informant's veracity or reliability and basis of knowledge remains highly relevant. . . ." (Internal quotation marks omitted.) *State* v. *Duntz,* supra, 216–17; see also *State* v. *Barton,* supra, 552. The affidavit in this case did not expressly state the informant's basis of knowledge.[22] Moreover, there was no indication whether the informant had personally observed the defendant's drug use and sales or had learned the information from another source. Indeed, nothing in the affidavit would have entitled the issuing judge reasonably to infer that the informant was reporting information

[22] In its brief in this court, the state conceded that the affidavit did not state the informant's basis of knowledge.

of which he had any basis of knowledge. See also *State* v. *Duntz,* supra, 217–18. This deficiency in the informant's basis of knowledge does not necessarily require us to disregard the informant's information, however, because the deficiency in the informant's basis of knowledge "may be overcome by a strong showing of the informant's reliability." *State* v. *Rodriguez,* supra, 141; see also *Illinois* v. *Gates,* supra, 233; *State* v. *Duntz,* supra, 218.

Accordingly, we turn to the informant's reliability. The affiants' assertion that the informant was reliable does not itself give the issuing judge a basis upon which to infer reliability.[23] See *State* v. *Telesca,* 199 Conn. 591, 603, 508 A.2d 1367 (1986); *State* v. *Tulli,* 14 Conn. App. 356, 358, 541 A.2d 515, cert. denied, 208 Conn. 809, 545 A.2d 1105 (1988). We note also that the informant's association with criminal activity, evidenced by his reportedly numerous proffers of information to the police, detracts from his reliability. See *State* v. *Telesca,* supra (reliability of informant who regularly supplies information to police is suspect because he is likely to be involved in criminal activity or to associate with criminals); cf. *State* v. *Rodriguez,* supra, 141 and n.11 (police not obligated to establish reliability of citizen informants).

Despite these indicia of unreliability, the issuing judge nevertheless was entitled to determine that the informant was reliable. First, the affiants stated that the informant had been used "numerous times in the past for various narcotic[s] cases." The issuing judge could reasonably have inferred from this statement that the informant had given trustworthy information in the past and, therefore, was reliable. Although this inference would have been better supported by an affirma-

---

[23] In its brief in this court, the state conceded that the affidavit did not state any reason for the affiants' conclusion that the informant was reliable.

tive statement by the affiants that this informant's information had, in the past, led to arrests and convictions; see, e.g., *State* v. *Rodriguez, supra,* 136 (affidavit stated that informant has "also given information in prior cases *that . . . led to arrests and convictions*") (emphasis added); we do not require affiants to invoke "formulaic phrases" in a search warrant affidavit. *State* v. *Barton, supra,* 549. In addition, the issuing judge reasonably could have concluded that the glassine baggies and short cut straws recovered during the garbage pulls corroborated the informant's allegations that the defendant was selling one ounce quantities of cocaine from his home and was a heroin user. Such corroboration would be a proper ground on which to base an inference of reliability. *State* v. *Rodriguez, supra,* 136–37. Finally, the issuing judge could properly have inferred the informant's reliability from the fact that "the informant was not anonymous, but known [by the police,] and therefore risked both loss of credibility with the police and possible prosecution for falsely reporting an incident under General Statutes § 53a-180 had his information proved to be fabricated." *State* v. *Johnson, supra,* 564. Taken together, under the totality of the circumstances, this information amounted to a sufficiently strong showing of the informant's reliability and, therefore, compensated for a lack of information regarding his basis of knowledge.[24]

## B

Second, we consider the information contained in the affidavit that derived from the garbage pulls, which we

---

[24] In light of our conclusion that the issuing judge was entitled to credit the informant's information as reliable, we need not address the state's contention that the inference of reliability was supported by certain other factors, such as the anonymous tip and the corroboration of information provided by the informant relating to the defendant's address and cars. We note, however, that the facts that the anonymous tip was received approximately three years prior to the informant's proffer of information

have held were valid under article first, § 7, of the Connecticut constitution. The relevant items gathered from the defendant's garbage were five glassine baggies and several short cut straws, which the affiants, who were experienced narcotics investigators, identified as drug paraphernalia. It was reasonable for the issuing judge to conclude, in light of the information provided, that the baggies and straws were, in fact, indicia of drug activity.

## C

We have defined probable cause as a "fair probability that contraband or evidence of a crime will be found in a particular place." (Internal quotation marks omitted.) *State* v. *Rodriguez*, supra, 135. In light of the information provided by the informant, which the issuing judge could reasonably have credited as reliable, and the items gathered by police investigation, which the issuing judge could reasonably have concluded were indicia of drug activity, we hold that the issuing judge had a substantial factual basis upon which to conclude that probable cause existed.

The judgment is affirmed.

In this opinion CALLAHAN and NORCOTT, Js., concurred.

KATZ, J., with whom BERDON, J., joins, dissenting. Today the majority concludes that the citizens of Connecticut have no reasonable expectation of privacy in their garbage when that garbage has been placed in

and that its source was unknown may diminish its significance as a factor supporting the informant's reliability. Cf. *State* v. *Barton,* 219 Conn. 529, 550–51, 594 A.2d 917 (1991). Moreover, we question whether verified information regarding such mundane facts as the defendant's address and the model of his cars, taken by itself, may properly be found to establish the reliability of an informant. Cf. *State* v. *Cofield,* 220 Conn. 38, 47, 595 A.2d 1349 (1991).

sealed, opaque bags at the curb. They hold that article first, § 7, of the Connecticut constitution affords no protection against systematic police searches of those bags. The majority does not exclusively rely upon *California* v. *Greenwood,* 486 U.S. 35, 37, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) (fourth amendment to the federal constitution does not protect garbage placed at curb for collection against warrantless police searches and seizures),[1] but instead relies upon statutes as well as the existence of unwelcome intruders to hold that it is not reasonable for Connecticut citizens to have an expectation of privacy in their garbage.

Both the majority and this dissent address only the second prong[2] of the two-part standard that has traditionally been used under the federal constitution to assess whether a warrantless search and seizure of property has violated a person's constitutional rights. See *Katz* v. *United States,* 389 U.S. 347, 361, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967) (Harlan, J., concurring). The issue is whether, in Connecticut, the owners or custodians of garbage placed at the curb have an expectation of privacy that the citizens of Connecticut would consider reasonable. I believe they do.

---

[1] This opinion is not based upon the textual difference between the two constitutional provisions, which is only one of several tools of analyses that should be employed in construing the contours of our state constitution. *State* v. *Geisler,* 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). As this court has previously recognized, the language of article first, § 7, of our state constitution; see majority opinion, footnote 1, supra; and the fourth amendment to the United States constitution; see majority opinion, footnote 8, supra; are "quite similar." *State* v. *Marsala,* 216 Conn. 150, 159, 216 A.2d 58 (1990). Moreover, I agree with the majority that the state's attempt to draw a distinction between the words "effects" in the federal constitution and what the state claims is the narrower "possessions" in article first, § 7, is not persuasive.

[2] The state has briefly raised the question of the defendant's failure to meet the subjective prong of the *Katz* test. Neither the trial court, nor the Appellate Court relied upon or even suggested that the first prong had not been satisfied. Therefore, I will not make that assumption either.

The determination that a particular place[3] is shielded by the Connecticut constitution requires that the place be one that society is prepared to give deference to because of "its code of values and its notions of custom and civility . . . ." *United States* v. *Taborda,* 635 F.2d 131, 138 (2d Cir. 1980) (applying this test where fourth amendment is under consideration). Whether an expectation of privacy is legitimate under the Connecticut constitution depends on whether it is one recognized and permitted by the citizens of Connecticut. A constitutional expectation of privacy does not require an "untrammeled power to admit and exclude"; *Minnesota* v. *Olson,* 495 U.S. 91, 99, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990); and it does not require that the area involved be hidden from the public eye. *State* v. *Mooney,* 218 Conn. 85, 110–11, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). That the area involved was public is a relevant consideration, but does not mechanistically close the door upon the inquiry. *United States* v. *Ruckman,* 806 F.2d 1471, 1476 (10th Cir. 1986) (McKay, J., dissenting).

The tension between the immediate reaction to the word garbage and the reality of what we place in our opaque, sealed trash bag is not easily resolved. I believe that although the defendant's property may have been abandoned, his reasonable expectation of privacy therein was not. Nearly " 'every human activity ultimately manifests itself in waste products. . . .' A single bag of trash testifies eloquently to the eating, reading, and recreational habits of the person who produced it. A search of trash, like a search of the bed-

---

[3] As this court has stated, the relevant inquiry in deciding whether there is a reasonable expectation of privacy involves an examination into the particular place invaded. When the search is of a closed container, however, the particular "place" is the interior of the container. *State* v. *Mooney,* 218 Conn. 85, 103–104, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991).

room, can relate intimate details about sexual practices, health, and personal hygiene. Like rifling through desk drawers or intercepting phone calls, rummaging through trash can divulge the target's financial and professional status, political affiliations and inclinations, private thoughts, personal relationships, and romantic interests." *California* v. *Greenwood,* supra, 50 (Brennan, J., dissenting). Indeed, the contents of a sealed, opaque trash bag may be more private, and thus should deserve as much protection, as many other containers whose contents have been protected. *Arkansas* v. *Sanders,* 442 U.S. 753, 762 n.9, 99 S. Ct. 2586, 61 L. Ed. 2d 235 (1979) ("comparatively small, unlocked suitcase"); *State* v. *Mooney,* supra, 89 (duffel bag and cardboard box).

Even the majority recognizes that an examination of garbage may reveal highly personal information. It then lists categories of such material that "we think it reasonable for Connecticut residents to wish to maintain as confidential." See majority opinion, footnote 19. The majority suggests, however, that it is also reasonable for society to expect citizens to take affirmative steps—such as shredding or destroying—to hide garbage that they wish to keep private. How many of us, as Connecticut residents, feel the need to shred or destroy personal information before discarding it in order to protect its confidentiality?[4] The very fact that Connecticut residents customarily discard highly personal and typically confidential information into their garbage without first shredding or destroying it, is a strong indication that they expect these items to remain private. Although the majority believes that much of

---

[4] Moreover, the majority's suggestion that we shred our garbage is not sufficient to impede the prying eyes of determined government agents. E.g., *United States* v. *Scott,* 975 F.2d 927 (1st cir. 1992) (Internal Revenue Service agents seized and pieced together shredded documents reduced to 5/32 inch strips from the defendant's garbage).

what we discard is highly personal and that it is reasonable for people to want to maintain a privacy interest in such material, the majority, nevertheless, has concluded that our expectation of such privacy is unreasonable. This is where the majority and this dissent part company.

The majority first reasons that because we can assume that garbage left at the curb is readily accessible to animals, children, scavengers, snoops and other similar intruders, we lose an expectation of privacy in such garbage from the intentional and deliberate canvassing by the police. It further rejects totally that a person's expectation of privacy can differ with regard to different classes of people. The problem with these positions is that they allow garbage-pickers to dictate how we as a society choose to live and what values we choose to protect. The accessibility of garbage to outsiders is not dispositive unless we choose to condone, endorse and ratify such conduct.[5] Additionally, the mere fact that we recognize the possibility that an unwelcome scavenger may rummage through our garbage, is not the same as wholesale acceptance of detailed, systematic inspection by law enforcement. Merely because we are aware that leaving garbage for disposal may involve risks to our privacy interests does not mean that we need to add constitutionally to those risks through unrestrained scrutiny by police.[6] A.

[5] "The mere *possibility* that unwelcome meddlers *might* open and rummage through the containers does not negate the expectation of privacy in their contents any more than the possibility of a burglary negates an expectation of privacy in the home; or the possibility of a private intrusion negates an expectation of privacy in an unopened package; or the possibility that an operator will listen in on a telephone conversation negates an expectation of privacy in the words spoken on the telephone." (Emphasis in original.) *California* v. *Greenwood,* 486 U.S. 35, 54, 108 S. Ct. 1625, 100 L. Ed. 2d 30 (1988) (Brennan, J., dissenting).

[6] The majority maintains that we cannot have different expectations of privacy as to different people. To support its position against this distinc-

Amsterdam, "Perspectives on the Fourth Amendment," 58 Minn. L. Rev. 349, 406–407 (1974). It is more reasonable to expect that those who are authorized to remove garbage will do so in the manner provided by private contract or through municipal ordinance than to expect that the garbage collector, into whose care it has been deposited, or some scavenger will rifle through it.[7] See *State* v. *Schultz,* 388 So. 2d 1326, 1330 (Fla. App. 1980) (Anstead, J., dissenting). The possibility that an unwelcome intruder may scavenge

tion based on status, the court cites to *State* v. *Liptak,* 21 Conn. App. 248, 255, 573 A.2d 323, cert. denied, 215 Conn. 809, 576 A.2d 540 (1990), wherein the Appellate Court stated that "[i]f one has a reasonable expectation that various members of society may enter the property in their personal or business pursuits, he should find it equally likely that the police will do so." (Internal quotation marks omitted.) That opinion relied in part on this court's opinion in *State* v. *Brown,* 198 Conn. 348, 357, 503 A.2d 566 (1986), wherein we recognized a diminished expectation of privacy in common areas of a multifamily dwelling. Implicit in both these cases is that the areas in question have been exposed to at least some members of the public with the owner's permission. In this case, the defendant did not allow exposure of his garbage. All he allowed to be exposed to the public were the exteriors of opaque, sealed containers. Until the bags were opened by the police, the contents of the defendant's garbage bag were hidden from the public's view.

[7] There are several other instances of people turning containers over to a third party without compromising their privacy interest in the contents. " 'Were it otherwise, a letter or package would lose all Fourth Amendment protection when placed in a mail box or other depository with the "express purpose" of entrusting it to the postal officer or a private carrier; those bailees are just as likely as trash collectors (and certainly have greater incentive) to "sor[t] through" the personal effects entrusted to them, "or permi[t] others, such as police to do so." ' " *State* v. *Hempele,* 120 N.J. 182, 208, 576 A.2d 793 (1990), quoting *California* v. *Greenwood,* 486 U.S. 35, 55, 108 S. Ct. 1630, 100 L. Ed. 2d 46 (1988) (Brennan, J., dissenting). The difference between these examples and the case of trash is that with a letter or package the sender expects to lose his privacy once it is in the hands of the person to whom it is addressed, whereas with trash, the person depositing it expects that it will be destroyed without first being examined. Only when it has been "physically exposed" by the person depositing it with a third party can it be said that that person has no legitimate expectation of privacy in its contents. Note, "The Supreme Court—Leading Cases," 102 Harv. L. Rev. 143, 195 (1988).

through our garbage is not the foundation upon which this court should test what is reasonable.[8]

The public has characterized this conduct as " 'a disgusting invasion of personal privacy,' Flieger, Investigative Trash, U.S. News & World Report, July 28, 1975, p. 72 (editor's page); 'indefensible . . . as civilized behavior,' Washington Post, July 10, 1975, p. A18, col. 1 (editorial); and contrary to 'the way decent people behave in relation to each other,' ibid"; *California* v. *Greenwood,* supra, 52 (Brennan, J., dissenting); when it was done by a tabloid reporter to expose the details of Henry Kissinger's "intimate activit[ies] associated with the 'sanctity of [his] home and the privacies of [his] life . . . .' " (Citation omitted.) *Oliver* v. *United States,* 466 U.S. 170, 180, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984). Moreover, this unsavory and perhaps even revolting conduct is often illegal, particularly in our urban areas.[9]

In evaluating the reasonableness of a person's expectation that his sealed, opaque container will not be part of a systematic examination by police, we look to "understandings that are recognized and permitted by

---

[8] Additionally, the majority's reliance on the aerial view cases is misplaced. People can observe areas in which one might have a subjective privacy expectation by engaging in normal, everyday flying in airplanes or helicopters. Therefore, courts have held that any such subjective expectation of privacy would not be reasonable. *Florida* v. *Riley,* 488 U.S. 445, 451–52, 109 S. Ct. 693, 102 L. Ed. 2d 835 (1989); *California* v. *Ciraolo,* 476 U.S. 207, 215, 106 S. Ct. 1809, 90 L. Ed. 2d 210 (1986). Moreover, the Federal Aviation Administration would be most distressed to learn that flying, a highly regulated activity used for pleasure, business and war-related enterprise, can be placed alongside garbage picking as a reason to defeat a person's expectation of privacy.

[9] E.g., New London City Code of Ordinances § 11-59 (1989), entitled "Private Scavenging"; Enfield Town Code § 8B-6 (a), (b) (1991), entitled in part "Prohibition against Removing Recyclable Materials from Designated Disposal Site"; see also Branford Town Code § 213-20 (A) (1991), entitled "Scavenging Prohibited"; Stratford Town Code § 108-20 (1988), entitled "Scavenging in Town Dump Prohibited."

society . . . ." (Citation omitted; internal quotation marks omitted.) *Minnesota* v. *Olson,* supra, 100. It must be acknowledged that the state has the authority to regulate the disposal of garbage. "Were it not for such regulations, people who want to maintain the privacy of their garbage could either bury it in their backyards or burn it. They would need not then fear that the garbage might be disturbed by animals, children, scavengers, snoops, and other members of the public . . . or by unreasonable police searches. . . . [I]f pursuant to that authority it compels people to alter their conduct, it may not then contend that that conduct no longer deserves constitutional protection." (Citations omitted; internal quotation marks omitted.) *State* v. *Hempele,* 120 N.J. 182, 212, 576 A.2d 793 (1990). General social norms help define what expectations of privacy will be tolerated. *Robbins* v. *California,* 453 U.S. 420, 428, 101 S. Ct. 2841, 69 L. Ed. 2d 744 (1981). The social norm is to place garbage in opaque bags at curbside locations as in this case. If the defendant's privacy has been compromised, it is as a result of a law that controls the method by which he disposes of his personal effects in a manner that offers no protection from government scrutiny. See Hamden Town Code of Ordinances §§ 94.39 (A) and 94.22 (A) (1990).

The majority relies heavily on the recycling statutes for the position that because garbage collectors have a statutory duty to assist municipal authorities in identifying recycling violators, which duty must necessarily entail the authority to inspect the contents of garbage placed for collection; see, e.g., General Statutes § 22a-220c; the citizens of Connecticut, therefore, have a greatly diminished expectation of privacy. There are several reasons why such legislation is not a legitimate basis upon which to determine a constitutional right. The first is the existence of other legislation that could be relied upon to demonstrate that we do pre-

sume that the protections of article first, § 7, apply to garbage. Many local ordinances prohibit garbage picking at the curb. See footnote 9 of this dissent. While these regulations may have been enacted to protect the exclusive right of a city or its authorized agent to collect trash or to promote sanitation and cleanliness, they may also have been based upon the recognition that people do have an expectation of privacy in their trash that we want to respect and protect. If we also assume people know of these regulations, then their perception that their garbage will not be violated by outsiders becomes reasonable. *State* v. *Hempele,* supra, 208–209.

More importantly, the majority violates the most basic tenets of jurisprudence when it holds that our constitutional right to privacy is circumscribed by recycling legislation. The landmark case of *Marbury* v. *Madison,* 5 U.S. (1 Cranch) 137, 176–78 (1803), established: "The powers of the legislature are defined and limited; and that those limits may not be mistaken, or forgotten, the constitution is written. To what purpose are powers limited, and to what purpose is that limitation committed to writing, if these limits may, at any time, be passed by those intended to be restrained? . . . It is a proposition too plain to be contested, that the constitution controls any legislative act repugnant to it; or, that the legislature may alter the constitution by an ordinary act.

"Between these alternatives there is no middle ground. The constitution is either a superior paramount law, unchangeable by ordinary means, or it is on a level with ordinary legislative acts, and, like other acts, is alterable when the legislature shall please to alter it.

\* \* \*

"If an act of the legislature, repugnant to the constitution, is void, does it, notwithstanding its invalidity, bind the courts, and oblige them to give it effect?

. . . It is emphatically the province and duty of the judicial department to say what the law is. . . .

"So if a law be in opposition to the constitution; if both the law and the constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the constitution; or conformably to the constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty."

Government regulations become relevant only after it has been determined that constitutional protections apply. See, e.g., *Skinner* v. *Railway Labor Executives' Assn.*, 489 U.S. 602, 109 S. Ct. 1402, 103 L. Ed. 2d 639 (1989). Although the majority insists that it is not directly relying on the recycling statutes to determine that the defendant did not have a reasonable expectation of privacy in his garbage, it in fact relies on these statutes to inform Connecticut residents what to expect. The court is saying, in effect, to Connecticut citizens, that since these statutes exist, you can reasonably infer from them that your garbage is not private and, therefore, any expectation of privacy is unreasonable. How is this not reliance by the majority? I cannot condone the majority's use of state statutes to define the contours of our right to privacy under the Connecticut constitution.

Another reason that the recycling statutes should not be relied upon in the context of the case before us comes from the legislation itself. These recycling statutes were enacted based upon environmental considerations. See 33 H.R. Proc., Pt. 18, 1990 Sess., pp. 6098–99. Thus, the legislation that permits recycling collectors to examine an individual's garbage to determine compliance with the recycling laws does not ultimately determine a person's legitimate expectation of privacy. "A deter-

mination of the standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion.' *United States* v. *Place,* 462 U.S. 696, 703 [103 S. Ct. 2637, 77 L. Ed. 2d 110] (1983); *Camara* v. *Municipal Court,* [387 U.S. 523, 536–37, 87 S. Ct. 1727, 18 L. Ed. 2d 930 (1967)]." *O'Connor* v. *Ortega,* 480 U.S. 709, 719, 107 S. Ct. 1492, 94 L. Ed. 2d 714 (1987). In *O'Connor* v. *Ortega,* supra, 719–20, the court held that in the case of a search by a public employer, the employee's legitimate expectations of privacy must be balanced against the government's need for supervision and efficiency. The court stated that in order for the search to be reasonable, it must be work related. Id., 725–26. If it is not work related or if the search is for evidence of criminal misconduct, a warrant is required. See id., 721. Any compromise to our legitimate expectations of privacy can only be to advance the ultimate goal to which the search could contribute. *New Jersey* v. *T.L.O.,* 469 U.S. 325, 357–58, 105 S. Ct. 733, 83 L. Ed. 2d 720 (1985) (Brennan, J., concurring). Therefore, even if we assume the constitutionality of General Statutes § 22a-220c, which is not before us today, such legislation allows only for a very limited search by a refuse collector to determine if recyclable items are contained within an individual's garbage and did not contemplate a wholesale, systematic exploration by the police.[10] Additionally, the statute provides for

---

[10] Several lines of cases teach us that under some circumstances the purpose of a search is deemed relevant in deciding the degree of protection afforded by the fourth amendment. See *Hudson* v. *Palmer,* 468 U.S. 517, 527, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984) (under appropriate circumstances the purpose of a search is relevant to the question of whether a defendant's subjective expectation of privacy is reasonable under the fourth amendment); see also *Amezquita* v. *Hernandez-Colon,* 518 F.2d 8, 12 n.7 (1st Cir. 1975), cert. denied, 424 U.S. 916, 96 S. Ct. 1117, 47 L. Ed. 2d 321 (1976) (fourth amendment constraints on government as law enforcer

inspection based solely upon "reason." General Statutes § 22a-220c (a). Even if "reason" means only "reasonable articulable suspicion," it connotes at least a limited privacy right.

In this case, the defendant had a reasonable expectation of privacy in the contents of his trash bags and should be able to claim the protection of article first, § 7, of the Connecticut constitution. Without the reference to the items seized in the search of the defendant's trash, the warrant affidavit was insufficient to establish probable cause. Therefore, I would reverse the judgment of conviction and remand the case to allow the defendant to withdraw his conditional plea.

I respectfully dissent.

may be greater than as landowner); *Biehunik* v. *Felicetta,* 441 F.2d 228, 231 (2d Cir.), cert. denied, 403 U.S. 932, 91 S. Ct. 2256, 29 L. Ed. 2d 711 (1971) (administrative purpose, rather than criminal investigatory purpose, of seizure relevant to its reasonableness); *United States* v. *Hagarty,* 388 F.2d 713, 717–18 (7th Cir. 1968) (whether purpose of search is for criminal investigation or administrative purpose is relevant to scope of fourth amendment protection). "Thus, the purpose of the police invasion may shape the determination of the reasonableness of an expectation of privacy." *State* v. *Mooney,* 218 Conn. 85, 101 n.13, 588 A.2d 145, cert. denied, U.S. , 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991). The same principles apply to analysis of article first, § 7, of the Connecticut constitution.